UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X
                                                            :
UNITED STATES OF AMERICA                                    :
                                                            :
                                                            :          17 Cr. 610 (LGS)
                    -against-                                :
                                                            :      **OPINION AND ORDER**
GARY DAVIS, et al.,                                         :
                                        Defendants.   :
----------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/13/2018__

LORNA G. SCHOFIELD, District Judge:

Defendants are charged in a six-count indictment in connection with their alleged

association with a Drug Trafficking Organization (the "DTO"). Defendants Justin Cooper and

Michael Lamar bring various pretrial motions, including motions for separate trials, disclosure of

certain prosecution materials and suppression of evidence. For the reasons below, Lamar's

motion is denied. Cooper's motions to sever, for prompt disclosure of the identities of

informants and to preserve his right to make further motions are granted in part, but his other

motions are denied.

I.    **BACKGROUND**

Defendants Gary Davis, Ramel Jackson, Andrew Burrell, Qunetin Starkes, Andre

Cofield, Patrick Innis, Mathew Cooper, Justin Cooper, Naysean Chavis, Hassan Muhammad,

Chimba Carlos, Willam Ray, Jeffery Goodridge, Michael Lamar and Luis Gomez were arrested

pursuant to an initial indictment that was filed under seal on October 4, 2017.[1] A superseding

indictment (the "Indictment") was filed on January 8, 2018.[2] The Indictment charges as follows:

---

[1] Defendants Matthew and Justin Cooper are brothers. For the purposes of this Opinion, all
references to Cooper refer to Justin, as only he filed pretrial motions.
[2] Familiarity with the factual allegations underpinning the counts in the Indictment is assumed;
the facts discussed below are relevant for the adjudication of the present motions.

Count One charges Davis, Jackson, Burrell and Starkes with a racketeering conspiracy, based on their association with "Killbrook," a criminal organization that engages in narcotics trafficking, robbery and various acts of violence.

Count Two charges all fifteen Defendants with a conspiracy to distribute narcotics -- including "crack," heroin, cocaine and marijuana -- as members of the DTO.

Count Three charges Davis with murder in aid of racketeering, in conjunction with the killing of Bolivia Beck in the vicinity of the Mill Brook Houses.

Count Four charges Davis with use of a firearm for the murder of Bolivia Beck.

Count Five charges Jackson and Burrell with a firearms offense for the knowing use and possession of a firearm.

Count Six charges Ray with a firearms offense for the knowing use and possession of a firearm.

Of the fifteen Defendants named in the indictment, five have pleaded guilty. Defendants Davis and Starkes are the only remaining Defendants charged with both racketeering and narcotics offenses (the "Racketeering Defendants"). Defendants Cofield, Innis, Matthew Cooper, Justin Cooper, Chavis, Muhammed, Lamar and Gomez, who have been charged with only narcotics offenses, have entered pleas of not guilty (the "Narcotics Defendants"). The Court has scheduled one trial to commence on January 14, 2019.

## II.   DISCUSSION

Two of the Defendants have filed pretrial motions. First, Lamar moves to suppress wiretap evidence. Second, Cooper moves for (1) severance, (2) suppression of wiretap evidence, (3) suppression of evidence from his cellphone, (4) prompt disclosure of the identities of informants, (5) immediate disclosure of *Brady* and *Giglio* material, (6) timely production of all

Rule 404(b) evidence, (7) preservation of his right to make further motions, (8) permission to join in the motions of co-defendants and (9) any additional relief that is appropriate. For the reasons below, Lamar's motion is denied. Cooper's motions to sever, for prompt disclosure of the identities of informants and to preserve his right to make further motions are granted in part, but his other motions are denied.

### A.     Lamar

Lamar raises only one argument for why the wiretap evidence against him should be suppressed: the Government violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Title III"), and the Constitution, by presenting wiretap status reports to a series of judges -- as opposed to a single judge -- in a manner that diffused supervision over the wiretap to the point of "render[ing] the Constitutionally and statutorily mandated role of the issuing judge as supervising judge meaningless."

The investigation culminating in the Indictment involved the interception and recording of wire communications pursuant to Title III. Between February 8, 2017, and October 12, 2017, on six occasions, judges authorized the wiretapping of four cellphones belonging to Andre Cofield, Algi Crawford,[3] Alfonso Holloway and Patrick Innis. The Government intercepted Lamar's conversations pursuant to the wiretap of Innis's phone, which was authorized by Judge Cote -- who was the Part 1 Judge at the time -- on August 3, 2017.[4] Special Agent Nicholas Shafer of the FBI submitted an affidavit in support of the application. Interceptions of Innis's phone began on August 4, 2017, and ended on September 3, 2017. Judge Cote's order stated, "Pursuant to 18 U.S.C. § 2518(6), the Government shall provide to the Court a report on or about

---

[3] Crawford was charged in a separate indictment, 17 Cr. 609 (NRB).

[4] In this District, judges are assigned to Part 1 on a rotational basis so that a judge is always available to adjudicate emergency orders such as wiretaps.

the tenth and twentieth days (as computed pursuant to Fed. R. Crim. P. 45) following the date of the Order or the date interception begins, whichever is later, showing what progress has been made toward the achievement of the Objectives of the Interception and the need for continued interception."

The Government provided its ten-day progress report to Judge Failla, who had replaced Judge Cote as the Part 1 Judge, on August 15, 2017. On August 24, 2017, the Government presented its twenty-day progress report to Judge Caproni, who had replaced Judge Failla as the Part 1 Judge. On September 20, 2017, the Government applied to Judge Preska -- who was then the Part 1 Judge -- to reauthorize the wiretap of Innis's phone. Judge Preska granted the Government's application, which was supported by the sworn affidavit of Special Agent Nicholas Shafer of the FBI. The continued interceptions of Innis's phone began on September 21, 2017, and ended on October 12, 2017. Accordingly, at least four judges reviewed the documentation surrounding the wiretap of Innis's phone during the course of the investigation.

This seriatim judicial supervision of the Innis wiretap does not warrant suppression. Title III does not mandate the use of progress reports; rather, it states:

> Whenever an order authorizing interception is entered pursuant to this chapter, the order *may* require reports to be made *to the judge who issued the order* showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require.

18 U.S.C.A. § 2518(6) (emphasis added). Lamar argues that, although the statute does not require the use of progress reports, if an authorizing judge orders the Government to produce progress reports, then all such reports must be given "to the judge who issued the order." *Id.* In this case, Judge Cote issued the order requiring status reports; therefore, according to Lamar,

Title III was violated because the Government gave its status reports to Judge Failla and Judge Caproni.

Whether Title III places such a restraint on judges' ability to order status letters as they see fit need not be resolved, because even if Lamar's statutory interpretation is correct, it would nevertheless "not justify the extraordinary remedy of suppression." *United States v. Ganias*, 824 F.3d 199, 221 (2d Cir. 2016); *see also Davis v. United States*, 564 U.S. 229, 237, (2011) (noting the "heavy toll" exacted by suppression, which "requires courts to ignore reliable, trustworthy evidence," and characterizing suppression as a "bitter pill," to be taken "only as a last resort"). Title III provides three grounds for suppression:

> (i) the communication was unlawfully intercepted;
> (ii) the order of . . . approval under which it was intercepted is insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). Although Lamar argues that the wiretap evidence should be suppressed under either the first or third ground, neither ground is applicable.

The first ground for suppression does not apply, because the communication was not "unlawfully intercepted." "Not every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications unlawful." *United States v. Lambus*, -- F.3d --, 2018 WL 3553324, at *22 (2d Cir. July 25, 2018) (citing *United States v. Chavez*, 416 U.S. 562, 574-75 (1974)). Rather, "Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974); *accord Dahda v. United States*, 138 S. Ct. 1491, 1498 (2018). Accordingly, a "technical defect" only constitutes an "unlawful interception" if the

provision violated "was intended to play a central role in the statutory scheme." *Giordano*, 416 U.S. at 528; *accord Lambus*, 2018 WL at *22 ("[N]othing in the legislative history suggests that Congress intended this broad identification requirement to play a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance . . . .").

Failure to comply with the procedures contained in 18 U.S.C.A. § 2518(6) does not require suppression, because the provision does not "play a central role in the statutory scheme" -- progress reports are not mandatory, let alone "central." *Giordano*, 416 U.S. at 528. In fact, a wholesale failure by the Government to provide status reports after being ordered to do so does not trigger suppression. *See United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir. 1977) ("While these reports should have been timely filed, the sanction for failure to do so is surely not automatic suppression of the tapes."); *accord United States v. Bolt*, No. 07 Cr. 127, 2009 WL 44685, at *1 (E.D.N.Y. Jan. 7, 2009). As the statute did not require Judge Cote to provide the additional protections of progress reports, the fact that the progress reports were reviewed by Judges Failla and Caproni -- rather than Judge Cote -- does not merit the "extraordinary remedy of suppression." *Ganias*, 824 F.3d at 221.

The third ground for suppression also does not apply, because the Government complied with Judge Cote's authorizing order. The Fourth Order stated, "Pursuant to 18 U.S.C. § 2518(6), the Government *shall provide to the Court* a report on or about the tenth and twentieth days (as computed pursuant to Fed. R. Crim. P. 45) following the date of the Order or the date interception begins, whichever is later, showing what progress has been made toward the achievement of the Objectives of the Interception and the need for continued interception." The Government provided a status report "to the Court" when it sent the report to Judge Failla, who was the Part 1 Judge at the time. Furthermore, even if "to the Court" might imply that the status

report must be provided to Judge Cote, given that total noncompliance with an order requiring progress reports does not trigger suppression, *see Scafidi*, 564 F.2d at 641, then the noncompliance in question also does not trigger suppression.

Lamar also argues, without citing any authority, that the presentation of progress reports to judges other than the authorizing judge violates the Constitution. This argument fails, because the protection afforded by the wiretap statute is generally broader than that of the Constitution; the Fourth Amendment's "requirements are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized." *United States v. Donovan*, 429 U.S. 413, 427 n.15 (1977); *accord United States v. Yannotti*, 399 F. Supp. 2d 268, 271 (S.D.N.Y. 2005). Given that the wiretap authorization for Innis's phone identified the line and conversations to be tapped, the wiretap did not violate the Constitution, and the motion is dismissed.

### B.    Cooper

For the reasons below, Justin Cooper's motions to sever, compel disclosure of CI-1's identity and to preserve his right to file further motions are granted in part. Cooper's other motions are denied.

#### 1.   Severance

Cooper's motion to sever is granted in part and denied in part. Federal Rule of Criminal Procedure 8(b) allows joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The "'same series of acts or transactions' language . . . mean[s] that joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (Sotomayor, J.) (some internal quotation

marks and citations omitted); *accord United States v. Rutigliano*, 614 F. App'x 542, 547 (2d Cir. 2015) (summary order). In analyzing joinder under Rule 8(b), courts must "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice." *Rittweger*, 524 F.3d at 177 (internal quotation marks and citation omitted). With conspiracy charges, "[t]he established rule is that a non-frivolous conspiracy charge is sufficient to support joinder." *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988); *accord United States v. Van Praagh*, No. 14 Cr. 189, 2014 WL 4954162, at *5 (S.D.N.Y. Oct. 1, 2014). "Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by Co-defendants, is admissible against the defendant." *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998); *accord United States v. Parris*, No. 13 Cr. 17, 2014 WL 2745332, at *10 (S.D.N.Y. Jun. 17, 2014). "[M]embers of two or more conspiracies may be joined as defendants even where the members have not been charged as participating in one overarching conspiracy." *Rittweger*, 524 F.3d at 178. These rules reflect "a preference in the federal system for joint trials of defendants who are indicted together. Joint trials play a vital role in the criminal justice system, as they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *United States v. O'Connor*, 650 F.3d 839, 858 (2d Cir. 2011) (internal quotation marks and citations omitted).

Federal Rule of Criminal Procedure 14(a) states, "If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "Rule 14 does not require severance even if prejudice is shown; rather, it leaves

the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538–39. Severance should be granted "under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539; *accord United States v. Cacace*, 796 F.3d 176, 192 (2d Cir. 2015). "Circumstances that may warrant severance include allowing the jury to consider evidence that otherwise would not be admissible if the defendant were tried alone, or conversely, barring essential exculpatory evidence that would be admitted if the defendant were tried alone." *United States v. Sezanayev*, No. 17 Cr. 262, 2018 WL 2324077, at *2 (S.D.N.Y. May 22, 2018) (citing *Zafiro*, 506 U.S. at 539). "Differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials. Even joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (internal quotation marks and citations omitted). "[T]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993); *United States v. Tuzman*, 301 F. Supp. 3d 430, 440 (S.D.N.Y. 2017). "'[L]ess drastic measures [than severance], such as limiting instructions, often will suffice' to cure any risk of prejudice and permit joinder." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (quoting *Zafiro*, 506 U.S. at 539).

Cooper's motion to sever is granted in part and denied in part; his trial will be severed from the Racketeering Defendants, but not from the other Narcotics Defendants. Cooper requests -- and the Government does not oppose -- severing the Narcotics Defendants from the Racketeering Defendants, in order to avoid spillover prejudice from the evidence of violent acts

which will be admitted against the Racketeering Defendants. Severing the Narcotics Defendants from the Racketeering Defendants is proper to avoid "serious risk that a joint trial would compromise a specific trial right of one of the [Narcotics] defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. "Relief by severance may be more appropriate when the unrelated evidence reflects activities of a violent nature because the risk of substantial prejudice is greater." *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991); *accord United States v. Nadeem*, No. 13 Cr. 0424, 2014 WL 3563407, at *3 (E.D.N.Y. July 18, 2014). Here, there would be a "risk of substantial prejudice" if the evidence of the Racketeering Defendants' violent acts -- especially the death of Bolivia Beck -- were admitted in a trial where Defendant Cooper and the other Narcotics Defendants also stood accused. Accordingly, the Racketeering Defendants are severed from the Narcotics Defendants for purposes of trial.

Cooper's motion to sever his trial from that of the other Narcotics Defendants is denied. Cooper raises two arguments in support of severance. First, "Mr. Cooper and his Co-defendants have markedly different degrees of culpability, raising the risk of unfair prejudice. The evidence against Mr. Cooper is vastly disproportionate in comparison to the other defendants . . . ." Although "[t]here are, of course, cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice," this is not such a lopsided case. *Spinelli*, 352 F.3d at 55; *accord United States v. Hameedi*, No. 17 Cr. 137, 2017 WL 5152991, at *5 (S.D.N.Y. Nov. 3, 2017). While the Government has less evidence against Cooper than against the other Narcotics Defendants, the evidence against Cooper is not negligible; he is alleged to have participated in a controlled buy and a number of recorded phone conversations. "Differing

levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *Spinelli*, 352 F.3d at 55. Any potential spillover prejudice to Cooper from being tried alongside the other Narcotics Defendants can be cured with "less drastic measures . . . such as limiting instructions . . . ." *Page*, 657 F.3d at 129.

Second, Cooper argues that severing his trial from the other Narcotics Defendants would promote judicial economy, because his trial "could be completed in a very short time." This argument fails. Trying Cooper separately would likely be uneconomical, given that the Government would need to duplicate much of its evidence in the second trial in order to explain Cooper's role in the conspiracy. Even if a separate trial would be efficient, the Second Circuit has "never recognized the need for severance based on the size of the trial." *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993); *see also United States v. DiNome*, 954 F.2d 839, 842 (2d Cir. 1992) ("There is no support in case law or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence."); *accord United States v. Hawit*, No. 15 Cr. 252, 2017 WL 2271352, at *5 (E.D.N.Y. May 22, 2017). Cooper's motion to sever his trial from the other Narcotics Defendants is therefore denied.

## 2. Suppression of Wiretap Evidence

The Government recorded Cooper's conversations pursuant to the reauthorized wiretap of Innis's phone, which was signed by Judge Preska on September 20, 2017. Cooper moves to suppress the wiretap evidence on the basis that the "Government failed to establish that normal investigative procedures available to them were unlikely to succeed if tried, and because other normal investigative procedures had already proved successful." This motion is denied.

In order to approve a wiretap, an authorizing court must be satisfied that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Although a Title III wiretap is an "extraordinary investigative device," *Giordano*, 416 U.S. at 527, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009); *accord United States v. Parris*, No. 13 Cr. 17, 2014 WL 2745332, at *7 (S.D.N.Y. June 17, 2014). "Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the provision envisions is that the showing be tested in a practical and commonsense fashion." *Concepcion*, 579 F.3d at 218. Title III "does not [] reserve wiretaps as a last resort for law enforcement. It requires only that agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 78 (2d Cir. 2018) (internal citations and quotation marks omitted). Upon a motion to suppress evidence from a wiretap, it is necessary to "grant considerable deference" to the authorizing judge's decision, "ensuring only that the facts set forth in the application were minimally adequate to support the determination that was made." *Concepcion*, 579 F.3d at 217 (reversing the suppression of wiretap evidence for failure to afford sufficient deference); *see also United States v. Goode*, No. 16 Cr. 529, 2018 WL 919928, at *4 (S.D.N.Y. Feb. 15, 2018) ("In reviewing whether a wiretap was properly granted, the reviewing Court must take a position of deference.").

In this case, the affidavit of Special Agent Nicholas Shafer, which was the basis for the authorization, described facts that were at least "minimally adequate to support" authorization of

the wiretap.  *Concepcion*, 579 F.3d at 217.  The affidavit stated that, although law enforcement

"made headway" in the investigation by using traditional investigatory techniques, "these

methods cannot accomplish the objectives of the investigation," because "interception is the only

viable means of determining, among other things, who is supplying narcotics to Innis and

Cofield."

The affidavit explained why thirteen traditional investigatory techniques would be

inadequate as follows:

1. Undercover officers would not likely succeed in determining who supplied the DTO with narcotics or how the DTO laundered its proceeds, because "drug traffickers are unlikely to discuss the full extent of their activities or membership when dealing with an outsider."

2. Confidential informants would not likely succeed in determining who was supplying the DTO with narcotics, because members of the DTO would be unlikely to discuss such matters with an outsider, and any effort to "obtain such information would raise suspicions."

3. Physical surveillance would not likely succeed, because members of the DTO conducted business over the phone or in private areas.

4. Pole cameras installed in the Mill Brook Houses were not likely to succeed, because they do not allow officers to see what occurred inside the buildings.

5. Geolocation information would be inadequate for determining the DTO's source of narcotics, "because it cannot differentiate between criminal and non-criminal movement."

6. Telephone records and pen registers would be inadequate, because they do not provide access to the content of conversations between members of the DTO and it "is oftentimes extremely difficult to associate an individual with a telephone number."

7. Prior Title III interceptions had not yet revealed "(i) Innis's source of narcotics; (ii) the identities of other members of the DTO; and (iii) locations of importance to the DTO."

8. Grand jury processes are "unlikely to be useful in developing evidence concerning drug trafficking," because many of the potential witnesses "face prosecution themselves" and calling them to testify "would undoubtedly alert both

the subpoenaed witnesses and likely the Target Subjects as well to the pendency of the investigation."

9. Search warrants were unlikely to be effective, because law enforcement had not yet identified the DTO's "stash houses," and searches of cellphones would not reveal the contents of phone conversations.

10. Arrests would not likely achieve the goals of the investigation, because members of the DTO remained unidentified, arrested individuals might not cooperate and arrests would alert other members of the DTO to the investigation.

11. Witness interviews were unlikely to succeed, because "[w]itnesses are oftentimes extremely reluctant to testify as members of a DTO -- or even meet with law enforcement officers to discuss the DTO's operations -- for fear of reprisal from members of the DTO, especially where, as is the case here, the DTO consists of individuals who are from a small tightly knit community."

12. Trash searches were unlikely to succeed because the trash from suspects' apartments was combined with trash from other apartments, and the members of the DTO were unlikely to throw out incriminating materials.

13. Cooperating witnesses in related investigations were not sufficient to achieve the investigation's goal, because they only had historic information about the DTO, not current information.

These explanations "inform[ed] the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Kirk Tang Yuk*, 885 F.3d at 78. Accordingly, the affidavit was at least "minimally adequate to support" the wiretap authorization. *Concepcion*, 579 F.3d at 217.

Cooper argues that the affidavit was not sufficient, because the "listed investigative techniques had in fact yielded significant evidentiary results," and their continued use could be expected to produce further evidence. This argument is inapposite. Even though a wiretap is not required to be "a last resort for law enforcement," *Kirk Tang Yuk*, 885 F.3d at 78, it appears that the investigators in this case treated it as such, trying or considering twelve investigative techniques short of a wiretap. The fact that many of these alternative techniques provided fruitful information does not mean that they were likely to accomplish the ultimate goals of the

investigation -- i.e., expose the DTO's narcotics supplier, unidentified members and locations of importance. Cooper's motion to suppress the wiretap evidence is denied.

### 3. Suppression of Cellphone Evidence

Cooper's motion to suppress evidence taken from his cellphone on the basis that the information supporting the search warrant was stale is denied. When assessing the validity of a search warrant, a reviewing court must "accord considerable deference to the probable cause determination of the issuing magistrate." *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015) (citations omitted); *accord United States v. Gatto*, No. 17 Cr. 0686, 2018 WL 2465379, at *5 (S.D.N.Y. June 1, 2018). "Accordingly, the task of a reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *Thomas*, 788 F.3d at 350 (citations omitted); *see also Kanciper v. Lato*, 718 F. App'x 24, 27 (2d Cir. 2017) (summary order) ("With respect to a challenge to the probable-cause determination, the duty of a court reviewing the validity of a search warrant is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."). Under this standard, a defendant "who argues that a warrant was issued on less than probable cause faces a heavy burden." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991); *accord United States v. Melendez*, No. 16 Cr. 33, 2016 WL 4098556, at *4 (S.D.N.Y. July 28, 2016).

"[A] warrant lacks probable cause where the evidence supporting it is not sufficiently close in time to the issuance of the warrant that probable cause can be said to exist as of the time of the search -- that is, where the facts supporting criminal activity have grown stale by the time that the warrant issues." *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015) (internal quotation marks omitted); *accord United States v. Pizarro*, No. 17 Cr. 151, 2018 WL 1737236,

at *9 (S.D.N.Y. Apr. 10, 2018). "The law recognizes no bright-line rule for staleness, which must instead be evaluated on the basis of the facts of each case." *Raymonda*, 780 F.3d at 114 (internal citation and quotation marks omitted). "The two critical factors in determining staleness are the age of the facts alleged and the nature of the conduct alleged to have violated the law." *Id*. "Where the affidavit establishes a pattern of continuing criminal activity, such that there is reason to believe that the cited activity was probably not a one-time occurrence, the passage of time between the last alleged event and the warrant application is less significant." *Id.*

Cooper argues that the affidavit supporting the search warrant for his phone was stale, because it alleged only that Cooper made a controlled sale in May of 2017, and did not demonstrate "participation in a[n] ongoing patter of criminal activity." This argument fails. The affidavit submitted by Special Agent Anthony Snead on November 28, 2017, states that Cooper (1) was arrested in possession of the phone in question; (2) was a member of the DTO, which operated between 2007 and 2017; (3) sold ten small bags of crack cocaine to a cooperating witness on May 9, 2017; (4) told the cooperating witness that he got the drugs from Innis and (5) gave him his phone number.

Affording "considerable deference to the probable cause determination of the issuing magistrate," this evidence was sufficient to suggest that Cooper was part of an ongoing criminal enterprise, and that evidence would be found on his phone. *Thomas*, 788 F.3d at 350. Cooper told the cooperating witness that he was dealing drugs that he received from one of the DTO's suspected leaders, and providing the cooperating witness with his phone number suggests the desire for a continuing business relationship. "Courts have commonly [] found probable cause to search cellphones possessed by defendants arrested in connection with ongoing drug-distribution

crimes based on the experience of agents familiar with narcotics trafficking that traffickers commonly use cellphones to communicate in the course of their narcotics distribution, as well as to store relevant information, including the names and contact information of suppliers, purchasers, and confederates." *United States v. Hoey*, No. 15 Cr. 229, 2016 WL 270871, at *9 (S.D.N.Y. Jan. 21, 2016) (collecting cases).

Furthermore, to the extent that the search warrant was issued based on stale information (without finding that it was), the "good faith" exception nevertheless would apply. "Pursuant to the 'good faith' exception to the exclusionary rule, when police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *United States v. Vilar*, 729 F.3d 62, 83 n.17 (2d Cir. 2013) (internal citations omitted). Four scenarios exist where the "good faith" exception will not apply to a search undertaken with a warrant: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Raymonda*, 780 F.3d at 118. Here, Cooper does not claim misconduct on the part of the officers or the Magistrate Judge; he relies only on circumstances three and four. Even if the warrant application in this case were invalid, it was not "so lacking in indicia of probable cause" or "so facially deficient" to make "reliance upon it unreasonable;" it was -- at minimum -- a close call. *Id.* Cooper's motion to suppress cellphone evidence is denied.

### 4. Disclosure of Informants

Cooper's motion to compel the Government to disclose the identity of its informants is granted with respect to CI-1, but denied with respect to the Government's other informants. The Government maintains a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law," but "[t]he scope of the privilege is limited by its underlying purpose." *Roviaro v. United States*, 353 U.S. 53, 59–60 (1957); *accord In re The City of New York*, 607 F.3d 923, 942 (2d Cir. 2010). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement . . . ." *Roviaro*, 353 U.S. at 59. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61; *accord United States v. Philippeaux*, No. 13 Cr. 277, 2015 WL 405240, at *4 (S.D.N.Y. Jan. 30, 2015). In conducting this analysis, "no fixed rule with respect to disclosure is justifiable." *Roviaro*, 353 U.S at 62; *accord Garcia v. Lee*, No. 11 Civ. 1803, 2018 WL 2268129, at *17 (S.D.N.Y. May 17, 2018). "[T]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro*, 353 U.S. at 62. Whether the informant's identity is material "depend[s] on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.*

When applying the *Rovario* balancing test, the Second Circuit has cautioned, "The defendant bears the burden of showing the need for disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial."

*United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997); *accord Goode*, 2018 WL 919928, at

*18. Accordingly, a "defendant is generally able to establish a right to disclosure where the

informant is a key witness or participant in the crime charged, someone whose testimony would

be significant in determining guilt or innocence." *United States v. Saa*, 859 F.2d 1067, 1073 (2d

Cir. 1988); *accord United States v. Gomez*, No. 17 Cr. 602, 2018 WL 501607, at *3 (S.D.N.Y.

Jan. 19, 2018). But "[s]peculation that disclosure of the informant's identity will be of assistance

is not sufficient to meet the defendant's burden; instead, the district court must be satisfied, after

balancing the competing interests of the government and the defense, that the defendant's need

for disclosure outweighs the government's interest in shielding the informant's identity." *Fields*,

113 F.3d at 324; *see also Saa,* 859 F.2d at 1073 (2d Cir. 1988) ("[I]t is not sufficient to show that

the informant was a participant in and witness to the crime charged."); *accord United States v.

Delacruz*, No. 14 Cr. 815, 2015 WL 2211943, at *4 (S.D.N.Y. May 12, 2015).

Cooper maintains that disclosure of CI-1's identity in advance of trial is necessary to his

defense because:

> Here, the most significant aspect of the government's evidence against Mr.
> Cooper involves a controlled purchase of narcotics that was allegedly conducted
> by CI-1 with Mr. Cooper. The video recording of that transaction appears to have
> failed and did not capture it. Therefore, the only evidence that Mr. Cooper was
> actually involved will come from the testimony of CI-1. CI-1 has been identified
> as a paid informant for the NYPD who sold drugs for G-Shine before he began
> working for law enforcement. Given CI-1's possible motivations to make cases
> for the NYPD, and the singular nature of this evidence, its significance to the case
> is paramount.

This argument is persuasive. Even where a defendant's meeting with a confidential source was

recorded or viewed by law enforcement, there will often be sufficient need to justify disclosure

of the informant's identity. *See, e.g.*, *United States v. Roberts*, 388 F.2d 646, 648–49 (2d Cir.

1968) (holding that disclosure was required where the informant "was present during all the

significant events" and "was obviously a crucial witness to the alleged narcotics transactions," notwithstanding involvement of an undercover officer in many of the same events); *United States v. Gomez*, No. 17 Cr. 602, 2018 WL 501607, at *3 (S.D.N.Y. Jan. 19, 2018) (requiring disclosure where "but for the fact that the Defendants' meetings with the Confidential Source were apparently recorded, it is hard to imagine a stronger case for disclosure, as the Government's prosecution appears to rest entirely on what happened in the meetings with the Confidential Source"). Accordingly, in this case, where the Defendant's meeting with the source was not recorded or attended by an undercover officer, and the Government's case against the Defendant relies overwhelmingly on the informant's testimony, disclosure is necessary.

Although the Government contests the necessity of disclosure, it states that "VI-1 will be a witness at trial and therefor his identity will be disclosed to the defense with the CI-1's *Jencks Act* materials, and he will be available to the defense on cross examination." In this case, such assurances are not adequate. Pursuant to the Jencks Act, "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subp[o]ena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500. Although the Government typically discloses Jencks Act materials a few weeks before trial, *see United States v. Wey*, No. 15. Cr. 611, 2017 WL 237651, at *23 (S.D.N.Y. Jan. 18, 2017), district courts cannot compel the Government to provide Jencks Act materials until a witness has testified on direct. *See United States v. Coppa*, 267 F.3d 132, 145 n.10 (2d Cir. 2001) ("The Jencks Act was enacted to clarify that the Government need not disclose such statements to the defense until after the Government witness has testified against the defendant on direct examination in open court."); *accord Sezanayev*, 2018 WL 2324077, at *10.

Given the centrality of CI-1's testimony to the Government's case against Cooper, as the controlled buy is the principal evidence of Cooper's participation in the DTO, disclosing CI-1's identity only after his testimony is not sufficient -- it "is essential to a fair determination" of Cooper's cause that he know the identity of CI-1 in advance of trial. *Roviaro*, 353 U.S. at 60–61. Accordingly, the Government shall disclose to Cooper the identity of CI-1 at least two weeks prior to trial.[5]  To the extent that Cooper requests disclosure of the other confidential informants, whose testimony will be far less central to his case, such disclosure is not warranted under the *Rovario* balancing test, and the motion is denied.

### 5. Immediate Disclosure of *Brady* and *Giglio* Evidence

"The basic rule of Brady is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *Coppa*, 267 F.3d at 139 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)); *accord United States v. Djibo*, 730 F. App'x 52, 56 (2d Cir. 2018) (summary order). "Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Rowland*, 826 F.3d 100, 111 (2d Cir. 2016) (alteration in original) (internal quotation marks omitted).

However, "as a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *Coppa*, 267 F.3d at 146; *accord Nunez v. City of New York*, -- F. App'x -- , 2018 WL 2670512, at *2 (2d Cir. June 5,

---

[5] The Government does not argue that disclosure of CI-1's identity will endanger CI-1 or disrupt any ongoing investigations.  However, some sort of protective order may be warranted.  *See* Fed. R. Crim. P. 16(d).  The Government shall confer with defense counsel before moving for any such order.

2018) (summary order). Rather, "*Brady* material must be disclosed in time for its effective use at trial . . . . There is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial." *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008); *accord Djibo*, 730 F. App'x at 56 ("*Brady* requires disclosure in time for . . . effective use at trial.").

The Government represents that, "[w]hile the Government is not aware of any *Brady* material, should the Government become aware of any, it will produce it promptly." The Government's good faith representation of its continuing compliance with its *Brady* obligations is sufficient. *See, e.g.*, *United States v. Mangano*, No. 16 Cr. 540, 2018 WL 851860, at *17 (E.D.N.Y. Feb. 9, 2018) ("Courts in the Second Circuit generally do not compel immediate disclosure of *Brady/Giglio* materials where (1) the Government represents it is aware of and will comply with its *Brady/Giglio* obligations, and (2) the Defense does not provide any reason for suspecting the Government will not comply."); *United States v. Klein*, No. 16 Cr. 442, 2017 WL 1316999, at *16 (E.D.N.Y. Feb. 10, 2017) (internal quotation marks omitted) ("Where, as here, the government has made good faith representations to the court and to the defense counsel that it recognizes its disclosure obligations under *Brady*, and that it has complied with said obligations and will continue to do so in a timely manner, courts in the Second Circuit repeatedly have denied pre-trial requests for discovery orders."). Accordingly, Cooper's motion for immediate disclosure of *Brady* material is denied.

Pursuant to *Giglio*, the Government's obligation to disclose "[f]avorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Coppa*, 267 F.3d at 139. Cooper moves for the immediate disclosure of all *Giglio* material. The motion is denied.

> [I]t is a widely recognized customary practice in this District that *Giglio* material is turned over at the same time as material under the Jen[c]ks Act . . . .  Both types of material are typically produced a week or two before the start of trial, depending on the complexity of the case.

*Wey*, 2017 WL 237651, at *23 (internal quotation marks and citation omitted); *see also United States v. Seabrook*, No. 16 Cr. 467, 2017 WL 3995630, at *3 (S.D.N.Y. Sept. 11, 2017) ("The government has offered to disclose such materials two weeks prior to trial, which is enough time for its effective use.").

The Government states that it will "provide the defense with *Giglio* material prior to trial, and the Government is willing to confer with Cooper on a reasonable disclosure schedule." These representations by the Government are sufficient.  *See, e.g.*, *United States v. Gomez*, No. 17 Cr. 602, 2018 WL 501607, at *4 (S.D.N.Y. Jan. 19, 2018) ("Here, the Government represents that it is aware of those obligations and intends to comply with them by disclosing any impeachment material and Jencks Act materials . . . in accordance with the standard practices in this District. . . .  Those representations are sufficient at this juncture.") (internal citations omitted).  Cooper has not articulated a sound reason nor cited any case law to compel divergence from the Government's customary practice.  The parties shall confer by October 4, 2018, and agree on a date for the production of *Giglio* material a reasonable time prior to trial.  If those efforts fail, Cooper may renew his application for an order compelling disclosure.

### 6.  Disclosure of Rule 404(b) Evidence

Cooper moves to compel the Government to provide him with evidence of other crimes, wrongs or acts that the Government seeks to introduce at trial "against Mr. Cooper and any other co-defendant . . . well in advance of trial . . . ."  This motion for disclosure of Rule 404(b) evidence "well in advance of trial" is denied, but the Government must comply with its representation that "it will provide appropriate Rule 404(b) notice in a timely fashion in order to

permit Cooper an opportunity to challenge admission of such evidence and to permit the Court to make an appropriate finding."

Federal Rule of Evidence 404(b) provides that, "[o]n request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and (B) do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b). "Courts in this Circuit have held that two or three weeks['] notice is reasonable[, and] a longer period may be appropriate, depending on the circumstances." *United States v. Vaid*, No. 16 Cr. 763, 2017 WL 3891695, at *13 (S.D.N.Y. Sept. 5, 2017) (second alteration in original) (granting thirty days' notice due to the scope of the alleged conspiracy and number of defendants); *see, e.g.*, *United States v. Rahim*, 339 F. App'x 19, 23 (2d Cir. 2009) (summary order) (finding one week before trial is reasonable notice); *Goode*, 2018 WL 919928, at *17 (granting thirty days' notice); *United States v. Rivera*, No. 16 Cr. 175, 2017 WL 1843302, at *1 (S.D.N.Y. May 8, 2017) (granting three weeks' notice); *see also United States v. McDow*, 206 F. Supp. 3d 829, 857 (S.D.N.Y. 2016) ("[Rule 404(b)] establishes no minimum time . . . because the evidence the government wishes to offer may well change as the proof and possible defenses crystallize.") (second alteration in original) (internal quotation marks and citations omitted). In this case, Cooper has provided no reason why it is necessary to depart from this practice; accordingly, his motion is denied. Should the Government fail to provide notice of the 404(b) evidence it intends to use two weeks before trial, Cooper may again move for its disclosure.

### 7. Further Motions

Cooper moves to preserve his right to make further motions upon the basis of newly discovered information. Specifically, Cooper states that he is yet to receive a copy of the search

warrant application underlying the November 3, 2016, search of his home, and therefore cannot evaluate the merits of filing a motion to suppress the fruits of that search. The motion is granted as unopposed. *See, e.g.*, *United States v. Galanis*, 656 F. App'x 560, 563 n.1 (2d Cir. 2016) (summary order) (granting a motion to seal as unopposed); *United States v. Buck*, No. 13 Cr. 282, 2017 WL 5201447, at *3 (S.D.N.Y. Oct. 30, 2017) (granting a motion to preclude as unopposed). Cooper may move to suppress the fruits of the November 3, 2016, search of his home within two weeks after receiving the search warrant application from the Government or two weeks after the filing of this opinion, whichever is later. To the extent that Cooper seeks to file additional motions not predicated on that search, he shall file a letter describing the newly discovered evidence and requesting permission to file such a motion.

### 8. Joining Co-defendants' Motions

Cooper's motion to join in the pretrial motions submitted by his Co-defendants is denied as premature. No pretrial motions are pending, outside of those resolved in this Opinion. Should one of Cooper's Co-defendants file a pretrial motion in which Cooper seeks to join, he may file a letter on ECF requesting permission to join.

### 9. Additional Relief

Cooper moves "for any additional relief that this Court deems just and proper." No such relief is appropriate, and the motion is denied.

## III. CONCLUSION

For the foregoing reasons, Defendants' motions are DENIED in part and GRANTED in part as follows:

 1. Lamar's motion to suppress wiretap evidence is DENIED.

2. Cooper's motion to sever is GRANTED to the extent he requests severance from the Racketeering Defendants, and DENIED to the extent he requests severance from the other Narcotics Defendants.

3. Cooper's motion to suppress wiretap evidence is DENIED.

4. Cooper's motion to suppress evidence found during the search of his cellphone is DENIED.

5. Cooper's motion for prompt disclosure of the identity of CI-1 is GRANTED, but his motion for disclosure of the Government's other informants is DENIED; the Government shall disclose CI-1's identity at least two weeks prior to trial.

6. Cooper's motion for immediate disclosure of *Brady* and *Giglio* material is DENIED. The Parties shall confer about a reasonable disclosure schedule by October 4, 2018.

7. Cooper's motion for early disclosure of Rule 404(b) evidence is DENIED.

8. Cooper's motion to preserve his right to file further motions is GRANTED with respect to a motion to suppress the fruits of the November 3, 2016, search of his home, but DENIED with respect to other potential motions; Cooper may move to suppress the fruits of the November 3, 2016, search of his home within two weeks after receiving the application from the Government or two weeks after the filing of this opinion, whichever is later.

9. Cooper's motion to join in the motions of his Co-defendants is DENIED.

10. Cooper's motion for discretionary relief is DENIED.

Defendants Carlos and Ray also filed pretrial motions before they pleaded guilty. These motions are DENIED as moot. The Clerk of Court is respectfully directed to close the motions at Docket Nos. 151, 158, 161 and 164.

Dated: September 13, 2018
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE